INTERDYNAMICS, INC., et al., Plaintiffs.

v.

FIRMA WOLF et al., Defendants.

Civ. No. 78–647.

United States District Court, D. New Jersey.

Jan. 22, 1980.

The Barnard patent covers a device designed to be attached to the inner surface of the rear window of an automobile, so constructed that by the application of voltage from the electrical system a current will flow and generate heat. This heat has the useful function of defrosting or defogging the rear window of the car under conditions of snow, ice or condensation.

Although nothing in the disclosure or claims so restricts it, the record is clear that the Barnard device is mainly intended for what may be called the "after market", i. e., to supply a device for rear window defrosting and defogging to the owners of cars purchased without such a feature. In principle, it could presumably be used as a means to provide original equipment by the auto manufacturer, but this does not appear to be its actual market.

Some brief history, noted in the record, may be observed as a matter of judicial notice. This history indicates that until relatively recent times, the manufacturers of the typical passenger car did not provide means for keeping the rear window clear of accumulations of ice, snow or condensation. In the post-war period, some manufacturers did offer, as an extra option, a rear-window defroster that made use of a fan to blow warm air along the inside surface, either employing a heating element within the blower (as in the common hair dryer) or else picking up air warmed by the car's heater and circulating it in concentrated fashion along the inner surface of the rear window. Such blower systems were also available on the accessories market, for installation by a mechanically apt owner or by a neighborhood service station.

Sometime around the later 1960's or very early 1970's manufacturers began offering electrically heated rear windshields to achieve the same purpose. So far as is known, such devices have always been, and are today, offered as optional extras. At the start, the approach used was to embed the thin heater wires within the glass of the rear window itself. Possibly due to the cost involved, the modern method is to apply stripes of electrically conducting paint to

Pitney, Hardin & Kipp, Newark, N. J., for plaintiffs.

Kirsten, Friedman & Cherin, Newark, N. J., for defendant Trans Tech, Inc.

## OPINION

BIUNNO, District Judge.

The complaint here was filed March 30, 1978, based on a claim of infringement of U.S. Patent 3,757,087, issued September 4, 1973 to Domenic Paul Edmund Barnard (hereafter, the Barnard patent or the '087 patent), and assigned to Smiths Industries, Limited (of London, England). Interdynamics holds the rights to the patent for the U.S.

The defendants are Firma Wolf, a Dutch corporation based in Rotterdam, Arend Wolf, an individual who is a resident and citizen of Holland, and Trans Tech, Inc., a New Jersey corporation based in Saddle river.

the inner surface of the rear window, probably by some glazing or bonding system, but in any event terminating in a wire connection running to a switch and then to the electrical supply (battery) of the car to provide the energy.

As the disclosure in the Barnard patent explains, devices had been made and marketed as automobile accessories which consisted of a pair of flexible, clear plastic sheets sandwiched together with a heating element between. Such devices could be attached to a rear window, as by rubber suction cups, and the terminals connected to a switch and the electrical supply. These devices suffered from various disadvantages, claimed to be overcome by the Barnard patent, such as discoloration of the plastic sheet, or the accumulation of dust and grime on the inaccessible surfaces of the rear window and the plastic sheet which faced each other, and the like.

The novel feature of the Barnard patent, as the court reads its scope, is the providing of an intermediate and partially discardable device which can be employed to attach an electrical heating element to the inner surface of the rear window itself, in a fashion such that when the application is completed the only material attached to the glass is the heating element. The end result is thus much the same as the painted electrically conductive stripes furnished as an optional extra by automobile manufacturers.

The Barnard device accomplishes this by sandwiching the complete heating element, in the physical dimensions and array intended, between two removable sheets. One sheet is a protective cover only lightly attached which can be stripped away without disturbing the arrangement of the heater stripes on the second sheet. The heater stripes themselves, which appear to be a thin aluminum or alloy foil, are provided with an adhesive coating that from observation is "pressure sensitive", in that upon being applied to the rear window, will stick to it with more adhesion (i. e., more strongly) than the temporary bond between the stripes and the second or mounting sheet. The testimony also is that this adhesive, in

addition to being pressure sensitive for the initial application, is also "thermosetting", in that it is cured or hardened by the application of heat when current is passed through the stripes.

Thus, the design is that the protective sheet is first removed. Then the exposed surface is applied to the inner surface of the rear window with suitable rubbing or other pressure to cause the heater element stripes to adhere to the glass. Then the second or mounting sheet is stripped away, leaving the heater element, in its original configuration, attached to the rear window. After attaching wire connections to the switch and battery, the heater is ready for use.

At the time the complaint was filed, Trans Tech was marketing a competing product manufactured by Wolf in Holland and shipped here. That product simulated the Barnard product in that it was composed of a like "sandwich" consisting of a mounting sheet and protective sheet, with heater elements between. There the simulation ended because the Wolf product was made up of a pair of heater element stripes in a continuous roll, and not as a pre-arrayed, configurated rectangular defroster ready for application. A user of the Wolf device would be obliged, in effect, to assemble the complete configuration by applying a number of pairs of heater stripes to the rear window after cutting the roll to the requisite length, and then connecting the ends of the horizontally arrayed stripes with vertical conductors eventually leading to connectors for attachment to wires running to the switch and battery.

Trans Tech did not file an answer to the complaint. Instead, after some motions by the Wolf defendants to dismiss for lack of jurisdiction, the court was presented with a consent judgment, stipulated to by plaintiffs and by Trans Tech, conceding both validity and infringement and for entry of permanent injunction. This was filed September 6, 1978.

Thereafter Trans Tech began marketing a new product. An order to show cause to hold Trans Tech in contempt for violation

of the permanent injunction was issued and a hearing thereon was held. Because of doubt in the court's mind whether the issue could be decided properly on a summary contempt proceeding, in view of differences between the admittedly infringing Wolf product and the new Trans Tech product, provision was made for discovery and plenary hearing and the issue was tried in full on the question whether the new Trans Tech product infringed any claim of the Barnard patent.[1]

After full review of the testimony, exhibits and briefs submitted, the court concludes that the new Trans Tech product does not infringe any claim of the Barnard patent and that its conduct is not a violation of the permanent injunction entered by consent.

■■ This finding and conclusion rests on the court's view that the scope of the claims of the Barnard patent is extremely narrow. The meaning of the English words in the claims cannot be read so broadly as to embrace within the patent monopoly anything already in the public domain. Old articles and known applications cannot achieve patent protection merely because of the addition of a novel and useful feature or variation. Only the novel and useful added feature or variation can come within a claim read in the context of the state of the art.[2]

■ The Barnard patent cannot be read to cover the basic concept, long known, that heat may be generated and applied to a surface by passing an electric current through a resistance. Ohm's Law, discovered by Georg Simon Ohm sometime before his death in 1854, states all the necessary principles. Six volts applied to one ohm will cause six amperes to flow. Within the conductor, the square of the current (6 x 6 = 36) times the resistance (1) provides the wattage generated (36 watts), easily converted into B.T.U. heat units by established formula. Twelve volts applied to two ohms will also cause six amperes of current to flow, but now the square of the current (36) times the resistance (2) provides twice the wattage (72) and twice the heat so long as all of the wattage is converted to heat, as is the case in this kind of device. In these examples, the much smaller resistance of the connecting wires is ignored.[3]

1. The cases which gave the court concern whether it could rule on the new Trans Tech product in a summary contempt hearing were referred to in the comments made in the transcript of the November 13, 1978 hearing and need not be repeated here. Suffice it to say that the question whether the new device is only colorably different from the previously enjoined device or from the patent was rendered moot by the procedure of allowing relevant discovery and a plenary hearing in the cause. This avoided burdening Interdynamics with the filing of a new suit, yet provided Trans Tech with more than a summary hearing. At the end, the controlling question then is whether the new Trans Tech device infringes any claim of the patent. If it does, then it would also support a finding of contempt.

2. That a patent combining a number of features cannot achieve monopoly for those features already known in the prior art and in the public domain is obvious. It is for this reason that the claims of such a patent must be read in that context. File wrapper history showing rejection of a submitted claim as anticipated by prior art is strong evidence to aid the court in construing the patent and determining the scope of the claims. See, *Graham v. John Deere, etc.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The record here shows that claims originally submitted were for an intermediate with only the heater elements, adhesives, and a mounting sheet, but with no protective sheet to make a sandwich. That claim would cover the new Trans Tech device (except that it was for a completely formed array), but it was rejected.

3. The laws governing the electrical resistance of metallic conductors are and have been well and long known. These are:

1. *Material.* All other conditions being the same, each metallic material has its own unique resistance, which is the reciprocal of conductance. Thus, for a wire $1/1000$th inch in diameter and one foot long (a mil foot), the following resistance in ohms is characteristic of the materials shown below.

Silver, 9.76 ohms     Platinum, 58.80 ohms
Copper, 10.38 ohms     Iron, 63.08 ohms
Aluminum, 19.00 ohms     German silver, 135.92 ohms

2. *Area.* This refers to the cross section area of a conductor of uniform dimensions. The resistance is inversely proportional to the cross section area. Thus, doubling the cross section area reduces the resistance to $1/2$.

3. *Length.* The resistance of a conductor is directly proportional to its length. Ten feet of a given conductor will show 10 times the

The common electric heating pad is a reflection of an application of Ohm's Law. So is the glass "hot tray", which also has an electrical resistance applied to the glass, to keep food and beverages warm.

Thus, the format of an electrical resistance, attached to a surface, with a voltage applied to generate heat to that surface, was long and well known in 1973 when the patent was issued, and in 1971 when the application was filed. Nothing of that breadth can possibly be read sensibly within the scope of the claims, no matter how broadly phrased.

■ As this court reads the Barnard patent, the most that can be read to fall within the scope of the claims is not the final product desired by the purchaser—an array of electrical resistance elements on the rear window of his car—but an intermediate device that will enable him to achieve that end result in a form embodying the complete configuration, pre-arrayed, and mounted between two sheets of material the purpose of one of which is to protect the delicate elements in handling and of the other of which is to maintain the configuration and arrangement for mounting.[4]

Whether or not the Wolf product infringed the patent is not before the court. The parties stipulated that it did, and a judgment to that end was entered. It is not open to question between the parties. However, even if a court had found an infringement by the Wolf product after trial, it is clear that the Wolf product represented the outer boundary of infringement.

The new Trans Tech product differs significantly from that which the Barnard patent can legitimately assert to fall within the scope of its claims. It differs in that a pair of conductors, not in final configuration, are attached to a single sheet instead of being mounted between two sheets having different characteristics. To argue that this product infringes the Barnard patent would amount to arguing that resistance wire and adhesive infringe. It would amount to a patent on Ohm's Law for any application intended to generate heat on a surface by passing an electrical current through a resistance.

Exhibit C–1, from a catalog of a supplier of automobile accessories for the "after market", illustrates the type of warm air

resistance in ohms as one foot of the same conductor.

4. *Temperature.* The resistance of metallic conductors increases as its temperature rises. See, Essentials of Physics, by George A. Hoadley (American Book Company, 1913), par. 391, at pp. 354 to 356. This collection of rules is commonly taught to high school students by the acronym "MALT", referring to Material, Area, Length and Temperature.

The laws governing the generation of heat by the passage of electrical current through a conductor are derived from Ohm's Law. This law states that for a given conductor, the current (in amperes) is directly proportional to the electromotive force (in volts) and inversely proportional to the resistance (in ohms). It is usually written as $I = E/R$, where I is amperes, E is volts and R is ohms.

The rule for power consumed, in watts, is derived from Ohm's Law. By algebraic conversion, the voltage drop E across a resistance is equal to the current (in amperes) times the resistance (in ohms). That is, since $I = E/R$, then $E = I \times R$. Since power consumption (in watts) is the product of the voltage times the current, the equivalent $I \times \circledR$ may be substituted for E, resulting in the formula $I \times I\,R$, or $I^2 R$ = watts of power. See Hoadley, supra, par. 393 at p. 357, and par. 401–402 at pp. 362–363.

Any other good high school physics text will provide the same explanations.

As should be obvious, the generation of heat in this fashion represents a loss of energy when the object is to transmit a current from a power source to an appliance. The heat loss is useful, however, when it is generated for the purpose of applying the heat to some desired end. See, Hoadley, supra, par. 402 at p. 363, giving examples of various kinds of electric heaters.

4. Interdynamics argues vigorously that the doctrine of equivalents should control here. The argument is that when packaged in a roll, one surface of the plastic strip serves to support the aluminum stripes while the rear surface serves to protect those stripes on the next turn of the coil. Whatever the legitimate applications of that doctrine may be, the court is satisfied that none prevents a competitor from marketing a device which combines only features in the public domain and makes no use of a feature possessing the novelty and utility essential to validity. Where that novel and useful feature is omitted, as here, the doctrine cannot be relied on to draw in to the scope of the claims that which was in the public domain to begin with.

blower defroster mentioned above as the earlier kind of device for rear windows, and still the primary type of defroster, working from the car's heater, that is still used for front windshields since any kind of stripe would involve a degree of interference with the forward vision of the driver. No doubt there are kinds of clear, transparent, electrically conductive glasses that could be used, in principle, to provide an electrical defroster and defogger for the front windshield. However, since internal combustion engines are notoriously inefficient and generate considerable waste heat from the combustion process and from friction, there is a considerable amount of available heat that must be dissipated through a cooling system, and it is no doubt more economical to divert some of that waste heat to defrost or defog front windshields than it would be to provide an electrical heater.

Exhibit C–4 is a roll of aluminum or alloy foil, in a strip, provided with a pressure sensitive adhesive in much the same fashion as the common mending tape of many manufacturers. If the owner of a car wished to construct an electrical rear window defroster or defogger himself, the court sees nothing to prevent the use of such an electrically conducting tape, applied to the inner surface of a rear car window, to provide a suitable heating element for defrosting or defogging purposes by applying the battery voltage through a switch. See, also, Exh. C–2 and C–3 for other examples of tape rolls in forms that could be used in like fashion. Nor would such an application of a metallic conductor constitute an infringement of the Barnard patent unless it were possible to say that every application of a resistance to generate and apply heat to a surface would be an infringement. It is not possible to say that. The basic principle is too well known and too widely applied. Electrical resistances are known and available to place in gutters where they will prevent the formation of ice. They are available in runners to place over steps and walks to prevent the formation of ice or to dispose of accumulations of snow. They are available as tapes to wrap around water pipes that are subject to the risk of freezing in cold weather.

Given this context, it is plain that a sensible reading of the claims of the admittedly valid Barnard patent, as between these parties, must be limited to a prearranged array of heating elements sandwiched between the protective sheet and a mounting sheet designed to preserve the manufactured configuration and array of the heating elements. It cannot be read to cover electrical conductors and adhesives which must not only be cut and assembled, but which are provided only with a mounting sheet and no separate protective sheet.

In sum, the Barnard patent is a modern variation of the old and well known decalcomania usually based on the use of gelatin and a water-soluble release adhesive as means for transferring a pre-determined array from a mounting sheet to a surface to which the object is intended to be applied. The new Trans Tech product does not reach that level. To say that it did would be to say that the Barnard patent would be infringed by a bottle of electrically conducting paint and a brush used to apply the paint to a rear car window in a suitable array to serve as a defroster and defogger by the application of an electrical voltage and the passing of a current to generate heat.

For each and all of these reasons, the court concludes and finds that the new Trans Tech product neither infringes any claim, sensibly read, of the Barnard patent, nor violates the permanent injunction entered by consent in this case.

The foregoing opinion embodies the court's findings of fact and conclusions of law, as permitted by F.R.Civ.P. 52(a).

Submit order accordingly.