INTERDYNAMICS, INC., and Smiths Industries, Limited, Appellees

v.

Firma WOLF, Arend Wolf, and Trans Tech, Inc.

Appeal of TRANS TECH, INC.

No. 82–5044.

United States Court of Appeals, Third Circuit.

Argued June 25, 1982.

Decided Dec. 30, 1982.

Rehearing and Rehearing In Banc Denied Feb. 2, 1983.

158

See also, 493 F.Supp. 22, and 653 F.2d 93.

Albert E. Fey (argued), Kevin J. Arquit, Fish & Neave, New York City, S. Joseph Fortunato, Gregory C. Parliman, Pitney, Hardin & Kipp, Morristown, N.J., Henry R. Lerner, Levisohn, Niner & Lerner, New York City, for appellees.

Lloyd McAulay (argued), McAulay, Fields, Fisher, Goldstein & Nissen, New York City, Harold Friedman, Kirsten, Friedman & Cherin, Newark, N.J., Fred I. Sonnenfeld, Philip H. Busner, Sonnenfeld, Busner & Weinstein, New York City, for appellant.

Before GARTH and BECKER, Circuit Judges, and FULLAM,* District Judge.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case, involving a patent for an automobile rear-window defroster, presents two interesting questions of federal jurisdiction and one question of application of patent law. The case has a long and tortuous procedural history and is now before this Court for the second time. The suit originally was brought by appellees Interdynamics, Inc., and Smiths Industries, Limited ("Interdynamics"), alleging that appellant Trans Tech, Inc., had infringed a patent held by Interdynamics. The initial proceeding resulted in a consent decree enjoining Trans Tech from infringing any claim of Interdynamics' patent. A second proceeding began when Interdynamics sought to hold Trans Tech in contempt of the consent decree after Trans Tech commenced marketing a slightly different version of the

* Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsyl-    vania, sitting by designation.

product adjudged under the decree to be infringing. This Court reversed a judgment for Trans Tech, *Interdynamics, Inc. v. Firma Wolf,* 653 F.2d 93 (3d Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (*"Interdynamics I"*), holding that, in the context of a contempt proceeding, the district court should have applied the "doctrine of equivalents" and determined whether the new product alleged to be a contempt was "merely colorably different" from the product previously conceded to infringe. The Court reached the merits and remanded the case so that the district court might enter a judgment of contempt against Trans Tech; Trans Tech withdrew its second product from the market and began to develop the product involved in the present appeal.

This appeal arises from the district court's decision in a proceeding commenced when Trans Tech applied for an order that would require Interdynamics to appear and "show cause why a judgment should not be made" adjudging Trans Tech's new defroster not an infringement of the original patent and not in violation of the consent decree. After a hearing, the district court entered an order providing that Trans Tech's making, using, or selling of rear-window defrosters exemplified by the experimental sample submitted to the court "would be a civil contempt" of the original consent decree, and Trans Tech appealed.

This appeal raises three questions. The first is whether Trans Tech has appealed from a final order. Trans Tech contends that the district court's order was in the nature of a declaratory judgment, which is appealable pursuant to statute; Interdynamics asserts that a declaratory judgment was neither sought nor obtained and that no other statutory provision provides a basis for appeal. The second question is whether there exists an "actual controversy" between the parties, as required by the Declaratory Judgment Act: because Trans Tech has neither manufactured nor marketed the final product, and because Interdynamics has not brought or threatened to bring a contempt proceeding against Trans Tech, Trans Tech must satisfy the "actual controversy" requirement by showing that it reasonably feared another contempt proceeding brought by Interdynamics and that it had the immediate intention and ability to produce the proposed product. The third question is whether the district court, applying the patent-law "doctrine of equivalents" prescribed by *Interdynamics I,* committed clear error in finding that the Trans Tech product at issue was no more than colorably different from the product that had been the subject of the consent decree.

Although each of the questions presented is not without difficulty, we conclude that the judgment of the district court is appealable, that a justiciable dispute exists, and that the decision of the district court is not clearly erroneous.

I. *Procedural History and Factual Background*

On September 4, 1973, the United States Patent Office awarded Patent No. 3,757,087 (the "Barnard patent") for an automobile rear-window defroster. The Barnard patent was assigned to Smiths, a British company, which subsequently designated Interdynamics its United States licensee for the patent, granting the latter the right to market the product and to sue for patent infringement. This Court has described the patented article as follows:

[the] kit consists of a grid of metal heating strips sandwiched between a backing sheet and a top sheet of plastic. Installation of the defroster simply entails peeling off the backing sheet and placing the exposed strips and adhesive surface of the top sheet against the car window. The adhesive that covers the surface of the heating strips which contacts the glass is stronger than the adhesive attaching them to the top sheet on which they lie. Thus, when pressure is applied to the top sheet over the heating strips, the strips adhere to the window and the top sheet can be peeled away. This process leaves only the grid of heating strips on the surface of the window. This grid ·is then connected to the automobile's

electrical system and heat can be generated by passing electricity through the heating elements.

*Interdynamics I, supra,* 653 F.2d at 95.

Firma Wolf, a Dutch corporation owned by Arend Wolf, developed a similar defroster kit (the "Wolf product") in Europe and marketed its version in the United States through Trans Tech. According to the Court in *Interdynamics I:*

> The Wolf product differed from the Interdynamics kit in that the Interdynamics kit contains a single set of sheets supporting a full pre-arrayed grid of heating strips, while the Wolf product contained four sets of sheets. Each set in the Wolf product consisted of a backing sheet and a top sheet, between which were sandwiched two parallel heating strips also containing adhesives of different strengths. The sheets were long and narrow, and were packaged in coils. Installation of each set was performed as in the Interdynamics kit, except the four sets of heating strips had to be linked together as well as to the electrical system.

653 F.2d at 95.

In March 1978, after the Wolf product appeared on the American market, Interdynamics and Smiths filed an infringement action against Trans Tech, Firma Wolf, and Arend Wolf. On September 6, 1978, the parties, at Trans Tech's instigation, entered into a consent decree, which provided (in relevant part):

> 2. Barnard United States patent 3,757,087 for HEATING ELEMENTS, owned by plaintiff Smiths Industries, Limited and solely licensed to plaintiff Interdynamics, Inc., is both good and valid in law and is enforceable;
>
> 3. Defendant Trans Tech, Inc. has infringed Barnard United States patent 3,757,087 by using and selling rear window defrosters identified with the trademark "JUSTLIKE" and manufactured by defendant Firma Wolf under the direction and control of defendant Arend Wolf.

> 4. Defendant Trans Tech, Inc. and all those in privity with it are hereby enjoined from infringing any claim of Barnard United States patent 3,757,087. . . .

*Interdynamics, Inc. v. Firma Wolf,* No. 78–647 (D.N.J. Sept. 6, 1978) (order entering consent decree) (quoted in part in *Interdynamics I, supra,* 653 F.2d at 95). Interdynamics waived damages and, by signature of its counsel Henry R. Lerner, agreed that "the settlement agreement and consent judgment does not bar Trans Tech, Inc. from manufacturing rear window defrosters as long as they do not infringe United States Patent 3,757,087." Letter from Lloyd McAulay to Henry R. Lerner (June 14, 1978), App. 342–43.

Shortly after the entry of the September 6, 1978, consent decree, however, Trans Tech began to market a slightly different version of the Wolf product (the "first Trans Tech product").

> In this product, the four coils did not contain separate top and backing sheets but were instead constructed in continuous rolls, much like rolls of conventional adhesive tape. The smooth back of each layer of plastic sheet served as the protective surface for the heating strips and adhesive surface in the layer above. Thus the need for a separate covering sheet was eliminated. The Trans Tech product was otherwise identical to the Wolf product.

*Interdynamics I, supra,* 653 F.2d at 95.[1] Interdynamics thereupon applied for an order to show cause why Trans Tech should not be held in contempt for violating the consent decree; a show-cause order issued from the district court on November 2, 1978, and commanded that Trans Tech appear before the court on November 9, 1978.

Upon the conclusion of the contempt hearing, however, the district court decided that it could not rule on the contempt issue until it had determined whether the first Trans Tech product actually infringed the

---

1. The district court colorfully described the difference between the Wolf product and the first Trans Tech product as "the difference between a jelly sandwich and a jelly roll." *Interdynamics Inc. v. Firma Wolf,* No. 78–647, slip op. at 3 (D.N.J. Sept. 14, 1981) ("*Interdynamics II*").

Barnard patent. The court held a hearing focusing on infringement and ultimately found no infringement of the Barnard patent. It therefore concluded that Trans Tech had not violated the consent decree. *Interdynamics, Inc. v. Firma Wolf,* 493 F.Supp. 22 (D.N.J.1980).

Interdynamics appealed, and, on June 30, 1981, this Court reversed. *Interdynamics I, supra.* We held on that date that the district court had erred in treating the *contempt* proceeding as a *de novo* infringement proceeding and that, instead of comparing the first Trans Tech product with the Barnard patent, the court should have compared the first Trans Tech product with the Wolf product, which had been adjudicated (pursuant to the consent decree) to infringe the Barnard patent. Any other approach would "depriv[e] plaintiff [Interdynamics] of the benefit of the prior decree in which plaintiff waived its right to damages for Trans Tech's admitted infringement" and would disregard the "significant public interest represented by the doctrine of res judicata . . . ." *Interdynamics I, supra,* 653 F.2d at 98.

Thus, *Interdynamics I* laid down two rules. First, in a contempt proceeding following a consent decree, "the appropriate inquiry is whether the new product alleged to be a contempt is 'merely colorably different' from the product previously conceded to infringe." 653 F.2d at 98. Second,

> [i]n determining whether the changes made [in the new product are] merely colorably different and therefore a contempt, it is necessary to apply the well-established doctrine of equivalents. *Simmons Co. v. A. Brandwein Co.,* 250 F.2d 440, 450 (7th Cir.1957). This doctrine has been described by the Supreme Court as follows:
>
> > [I]f two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.

*Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608 [70 S.Ct. 854, 856, 94 L.Ed. 1097] . . . (1950).

> . . . Even if the new product may infringe the patent, as long as it is more than "colorably different" the infringement should not amount to a contempt nor should it be tested in contempt proceedings.

653 F.2d at 98–99. Applying those two doctrines to the product at issue, we concluded that the first Trans Tech product was merely colorably different from the Wolf product; we therefore remanded the case so that the district court might enter a judgment of contempt against Trans Tech.[2] 653 F.2d at 99.

Upon learning of this Court's decision in *Interdynamics I,* Trans Tech withdrew the first Trans Tech product and devoted its energies to developing a type of rear-window defroster that would not violate the 1978 consent decree. On August 26, 1981, Trans Tech applied to the district court for an order that would require Interdynamics to appear and "show cause why a judgement should not be made" adjudging Trans Tech's new defroster (the "second Trans Tech product") *not* an infringement of the Barnard patent and not in violation of the consent decree. The affidavit of Lloyd McAulay, Trans Tech's attorney, accompanied the proposed order. This affidavit described the second Trans Tech product, an "experimental sample" of which was attached, and enumerated various modifications that would be made in the sample before actual production. The request for a "Court determination on the issue of compliance with the Court order" was framed in the form of an application for an order to show cause, McAulay explained, because "Trans Tech is in a position of having to fill orders for its product within the next few weeks or going out of business," McAulay Aff. at ¶ 10, and a speedy determination would give Trans Tech a chance to retain customers who had placed orders for the

2. Trans Tech's petitions for rehearing and rehearing en banc were denied on July 23, 1981.

first Trans Tech product by selling them the second one, instead, *id.* at ¶ 13.

The district court issued the requested show-cause order on August 27, 1981, and held a hearing on September 8, 1981. In its opinion of September 14, 1981, the court described the second Trans Tech product:

> [it] consists of two rolls of conductor coated on one side with pressure sensitive adhesive, the two rolls being mounted on a mandrel [i.e., a shaft or spindle] to be set in a dispenser that will enable the user to lay out two parallel strips of conductor on the rear window surface. This system eliminated not only the protective sheet, but the mounting sheet as well. The mandrel and dispenser are thus relied on to enable the user to lay down spaced, parallel strips of conductor just as the Wolf product did, and just as the [first] Trans Tech product did.

*Interdynamics II, supra* note 1, slip op. at 4. Applying to the second Trans Tech product the standards established by this Court in *Interdynamics I, supra,* the district judge determined that "the proposed new product is no more than colorably different in comparison with the Wolf product," *Interdynamics II, supra* note 1, slip op. at 5, and explained that

> [t]he use of two rolls of adhesive coated conducter [sic], placed on a mandrel for mounting in a dispenser, will do the same work in substantially the same way to accomplish the identical same result, i.e., to lay down a parallel pair of conductors at a predetermined spacing, on the rear window, to build a rectangular array to serve as a heating element.

*Id.* The judge therefore ruled that "the proposed new product, if marketed, *would be* a contempt in violation of the injunction." *Id.* (emphasis added).

The district court also rejected Interdynamics' claim that Trans Tech's application in effect sought an impermissible advisory opinion relating to a product that had been neither marketed nor even manufactured. Ruled the court:

A party under restraint of a permanent injunction takes a needless risk in adopting a course of action which it believes (no matter how sincerely) will not contravene the judgment. The prudent course, when there is a disagreement on the question as there is here, is to apply for a construction of the judgment.

*Interdynamics II, supra* note 1, slip op. at 5.

Trans Tech has appealed from the district court's ruling that it would be in contempt if it marketed the second Trans Tech product. As we have noted above, we have before us three principal issues, one of which concerns whether we have an appealable order. Interdynamics contends that the district court's ruling is not appealable because it is neither a final order reviewable under 28 U.S.C. § 1291 (1976) (amended 1982) nor an interlocutory order reviewable under 28 U.S.C. § 1292 (1976) (amended 1982); nor, claims Interdynamics, did the district court entertain a suit brought under the Declaratory Judgment Act, 28 U.S.C. § 2201 (Supp. IV 1980). Trans Tech, on the other hand, asserts either that the district court granted declaratory relief under section 2201 or, in the alternative, that the order effectively constitutes a final decision under section 1291.

Interdynamics also has raised the question whether the district court had jurisdiction to rule on the second Trans Tech product, which, according to Interdynamics, was still at too tentative a stage to allow the district court to find the requisite case or controversy between the parties. Trans Tech naturally claims that the proposed product is sufficiently formulated, and the battle lines between the parties sufficiently drawn, to permit of adjudication. We elect to take up first the question whether the district court's order is appealable; we believe that our discussion of justiciability will proceed more logically if set within the framework established by our treatment of appealability.[3]

---

**3.** On April 20, 1982, Trans Tech filed a petition under Chapter XI of the federal Bankruptcy Law. 11 U.S.C. § 362(a)(1) (Supp. II 1978)

provides that the filing of a petition in bankruptcy "operates as a stay" of "the commencement or continuation, including the issuance or

## II. *Appellate Jurisdiction*

It is a fundamental proposition that "[t]he existence of appellate jurisdiction in a specific federal court over a given type of case is dependent upon authority expressly conferred by statute." *Government of Virgin Islands v. Hamilton,* 475 F.2d 529, 530 (3d Cir.1973). Before addressing the merits, we therefore must determine whether the judgment issued by the district court constitutes an appealable order.

### A. *Nature of the District Court's Order*

■ The order from which Trans Tech now appeals reads, in relevant part: "Trans Tech's making, using, or selling of rear window defrosters exemplified by the experimental sample which is Exhibit C to the McAulay affidavit, would be a civil contempt of this Court's injunction of September 6, 1978 [i.e., the consent decree]." *Interdynamics, Inc. v. Firma Wolf,* No. 78–647 (D.N.J. Oct. 2, 1981) (order and judgment holding Trans Tech in contempt). Appellate jurisdiction will not lie in this Court unless the district court's order constitutes a "final decision," appealable under 28 U.S.C. § 1291 (1976) (amended 1982), or an interlocutory order, appealable under 28 U.S.C. § 1292 (1976) (amended 1982).

The district court did not actually hold Trans Tech in contempt; rather, it declared that Trans Tech "would be" in contempt only if the company thereafter proceeded to produce and manufacture the second Trans Tech product. Because the district court's order expressly contemplated the initiation

of further legal proceedings before any sanctions would be imposed on Trans Tech, we doubt whether that order could be considered a "final decision" within the meaning of section 1291. Nor do we believe that the order is appealable as an interlocutory order under section 1292(a). However, we have before us a procedurally unusual patent case. In that context, and for the reasons that follow, we will read the district court's order as granting essentially declaratory relief and therefore hold that the order is appealable as a final decision, *see* 28 U.S.C. § 2201 (Supp. IV 1980).[4]

This Court elaborated almost forty years ago the function of a declaratory judgment in a patent-infringement context:

Prior to the passage of the Declaratory Judgment Act, the patentee was in a position to make oppressive use of his asserted monopoly while carefully avoiding the test of litigation with an alleged infringer. [Citations omitted.] Further, the patentee might, in his own good time, sue the alleged infringer for an accounting, after large damages on account of a possible infringement had accrued. The alleged infringer could not take the initiative in litigation to challenge the validity or scope of the patent.

In providing the remedy of a declaratory judgment it was the Congressional intent "to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see

---

employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title ...." However, sometime before June 21, 1982, Trans Tech, by its president, applied to the bankruptcy court for authorization to employ and appoint Lloyd McAulay and Fred I. Sonnenfeld to represent Trans Tech before this Court in the pending appeal, and the bankruptcy court granted the application on June 21, 1982. *In Re Transportation Technology Inc. t/a Trans Tech Inc.,* No. 82–02571 (Bankr.D. N.J. June 21, 1982) (order authorizing appointment of special counsel to debtor). Trans Tech produced the bankruptcy court's order during argument before us on June 25, 1982. We believe that the bankruptcy judge's order au-

thorizing counsel to argue this appeal suffices to lift the section–362(a) stay. We therefore see no threat to our jurisdiction from the bankruptcy proceedings.

4. In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (Supp. IV 1980).

fit to begin suit, after damage had accrued." *E. Edelmann & Co. v. Triple-A Specialty Co.,* 7 Cir., 1937, 88 F.2d 852, 854. This court has emphasized that the Act should have a liberal interpretation, bearing in mind its remedial character and the legislative purpose. [Citations omitted.]

*Dewey & Almy Chemical Co. v. American Anode, Inc.,* 137 F.2d 68, 69–70 (3d Cir.), *cert. denied,* 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943). *See also Wembley, Inc. v. Superba Cravats, Inc.,* 315 F.2d 87, 89 (2d Cir.1963) (expressing similar concerns and emphasizing that "the declaratory remedy should be construed with liberality in the patent field as in general"). We therefore recognize that declaratory judgments play a special role in patent cases, and our recognition of this role has influenced our characterization of the district court's order.

We understand, of course, that this latest proceeding brought by Trans Tech in the district court arose in the posture of an order requiring Interdynamics to show cause why Trans Tech should be held in contempt, and we acknowledge that Trans Tech did not expressly elect to sue under the Declaratory Judgment Act, 28 U.S.C. § 2201–2202 (1976 & Supp. IV 1980). However, a court is not bound by the procedural labels attached to the proceeding by the moving party.[5] What Trans Tech really sought was a judicial declaration of whether it could press forward with its plans for the second Trans Tech product. Trans Tech chose to proceed by way of an order to show cause because it believed that it thereby would obtain a speedier ruling from the previously assigned district judge, who already had jurisdiction to supervise the standing injunction he had issued pursuant to the 1978 consent decree. Although it might have been wiser for Trans Tech to have sued for a declaratory judgment, we are unwilling to say, on the facts of this case, that Trans Tech committed a fatal procedural blunder.

We thus find the proceeding below to have been essentially a declaratory-judgment suit. Assuming for the moment that the district court properly issued what we have characterized as declaratory relief, we hold that the district court's order is appealable as a final judgment or decree under sections 2201 and 1291.[6]

---

**5.** We note in this regard the willingness of some courts to treat requests for various other types of relief as declaratory-judgment suits. *See, e.g., Katzenbach v. McClung,* 379 U.S. 294, 295, 85 S.Ct. 377, 379, 13 L.Ed.2d 290 (1964) ("we may and do consider this complaint [for injunctive relief] as an application for a declaratory judgment under 28 U.S.C. §§ 2201 and 2202"); *Horne v. United States,* 519 F.2d 51, 52 (5th Cir.1975) (barring suit "seeking [tax] refund and also requesting that the deficiency be declared void" because declaratory judgments may not issue in tax cases and "plaintiff's request that the deficiency assessment be declared void is an attempt to have the Court issue a declaratory judgment"); *McLeod v. Peterson,* 283 F.2d 180, 187–88 (3d Cir.1960) (finding petition for writ of habeas corpus inappropriate because petitioner was not in custody, but treating complaint as if it had requested temporary restraining order and declaratory judgment); *Pavia v. Hogan,* 386 F.Supp. 1379, 1381 (N.D.Ga.1974) (treating federal prisoner's attempt to file civil action entitled "Motion to Dismiss Detainer-Warrant" as action under Civil Rights Act and petition for declaratory relief under 28 U.S.C. § 2201).

**6.** Because we treat the district court's order as declaratory, we find distinguishable such cases as *In re Arthur Treacher's Franchise Litigation,* 689 F.2d 1150, 1155 (3d Cir.1982), and *Fireman's Fund Insurance Co. v. Myers,* 439 F.2d 834, 838 (3d Cir.1971), which hold that civil-contempt orders generally are not directly appealable. We also note that the district court here did not actually adjudicate Trans Tech in contempt; rather, it declared that Trans Tech "would be" in contempt only if it continued to prepare the second Trans Tech product for market. Because the district court did not hold Trans Tech in contempt of the 1978 consent decree, we neither reach nor decide any issue involving appealability of post-judgment civil-contempt orders, which question we discussed in *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 628, 635–36 (3d Cir.1982) (en banc).

The lack of an actual contempt adjudication, however, does not make apposite *Major v. Orthopedic Equipment Co., Inc.,* 561 F.2d 1112 (4th Cir.1977), upon which Interdynamics relies. *Major* involved an action brought against a manufacturer by a distributor alleging violations of the distributorship agreement. The district court had enjoined the manufacturer (OEC) from terminating the distributorship and later held the defendant manufacturer in contempt. When the distributor (Major) again be-

### B. *Existence of an Actual Controversy*

█ Our conclusion that the district court granted what was in effect a declaratory judgment does not end our examination of the existence of appellate jurisdiction, for we next must consider whether this was a proper case for the awarding of declaratory relief. Interdynamics contends that the district court should not have ruled on the second Trans Tech product, as the new invention was only an "experimental sample" and therefore could not engender a present "actual controversy" between the parties. Because "the Declaratory Judgment Act requirement of an 'actual controversy' is identical to the constitutional requirement of 'cases' and 'controversies,'" *Cutaiar v. Marshall,* 590 F.2d 523, 527 (3d Cir.1979), Interdynamics' argument strikes at the core of the district court's jurisdiction under Article III of the United States Constitution.[7] We therefore must decide whether the district court exceeded its authority in adjudicating this case.

The Seventh Circuit's recent opinion in *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210–11 (7th Cir.1980), provides what is perhaps the most comprehensive formulation of the test that a court should apply in determining whether to grant declaratory relief in a patent case:

> In declaratory judgment actions concerning patents, there are two prerequisites to establishment of an actual controversy. First, the defendant must have engaged in conduct giving rise to a *reasonable apprehension* on plaintiff's part that it will face an infringement suit or the threat of one if it commences or continues the activity in question. [Citations omitted.] Second, the plaintiff must have actually produced the accused article or have engaged in preparations for production such that
>
> > but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the plaintiff would and could begin production immediately.
>
> *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 439 F.2d 871, 875 (1st Cir. 1971) [footnote omitted].

(Emphasis added.)[8] For cases adopting similar approaches, see, e.g., *Super Products Corp. v. D P Way Corp.,* 546 F.2d 748, 753 (7th Cir.1976); *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 439 F.2d 871, 874–75 (1st Cir.1971). This "reasonable apprehension and immediate intention and abili-

---

gan to represent other manufacturers, OEC filed a motion for clarification of the injunction, whereupon the court determined that Major's actions violated the injunction. Major appealed, but the Fourth Circuit found the district court's order unappealable because that order neither held Major in contempt nor took any other action even though it did find that Major had violated the injunction and the contract. "It [the order] therefore cannot be appealed as a contempt of court, either civil or criminal, and since it did not dispose of the case, the order is not final." 561 F.2d at 1115.

We believe *Major* to be inapposite to the present case for several reasons. First, the order issued in *Major* purported to be nothing more than a clarification of the standing injunction; it lacked the express invocation of contempt that we find in the case before us. Second, immediately after the district court had issued its order in *Major,* OEC filed a motion to dissolve the injunction; the motion had not been considered by the district court by the time the appeal from the previous proceeding reached the Fourth Circuit. Thus, the Fourth Circuit was being asked to rule on an opinion asserted to be advisory while a motion that

would dispose of the case was pending below. We do not find ourselves in such a position, as there are no matters currently before the district court. *Major* therefore does not advance Interdynamics' case.

**7.** See *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (complaint must satisfy "threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy"); *Powell v. McCormack,* 395 U.S. 486, 517–18, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969) (availability of declaratory relief "depends on whether there is a live dispute between the parties").

**8.** We realize that *International Harvester* vacated the order of the district court because the Seventh Circuit found no actual controversy that could sustain a declaratory-judgment action. We refer to this case because it enunciates the relevant legal precepts. For the reasons set forth below, however, *see infra* note 15 and pages 172–174, we believe that *International Harvester* is distinguishable on its facts from the case before us.

ty" test comports with the standards we recently adopted in *Rengo Co. Ltd. v. Molins Machine Co., Inc.,* 657 F.2d 535, 539 (3d Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981) (holding that potential infringer must have immediate intention and ability to practice the invention, and quoting from the Seventh Circuit's *Super Products Corp. v. D P Way Corp., supra,* 546 F.2d at 753–55, which also requires that moving party have "reasonable apprehension" of facing infringement suit).

We approach our inquiry with the recognition that 28 U.S.C. § 2201 has been interpreted as granting to the district court the discretion whether to award declaratory relief, *Bituminous Coal Operators' Association, Inc. v. International Union, United Mine Workers,* 585 F.2d 586, 596 (3d Cir. 1978); the district court's decision to grant such relief will not be reversed in the absence of an abuse of discretion,[9] *Exxon Corp. v. Federal Trade Commission,* 588 F.2d 895, 900 (3d Cir.1978).[10] We therefore must evaluate the propriety of declaratory relief against a background of deference to the district court's exercise of its discretion in balancing such factors as "(1) the likelihood that the declaration will resolve the

uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies," *Bituminous Coal Operators' Association, Inc. v. International Union, United Mine Workers, supra,* 585 F.2d at 596–97 (footnote omitted). Based on the record before us, we hold that the district court did not abuse its discretion in determining that Trans Tech reasonably feared another contempt proceeding brought by Interdynamics and that Trans Tech demonstrated the requisite immediate intention and ability to produce the second Trans Tech product.

### 1. *Reasonable Apprehension.*

We begin our discussion with one proposition that apparently has united all courts that have considered the question: in order to demonstrate the requisite reasonable apprehension of a patent-infringement or contempt proceeding brought by Interdynamics, Trans Tech need not prove that Interdynamics expressly has threatened to take legal action against Trans Tech.[11] Instead,

> [W]here the district court has declined jurisdiction, we will not reverse merely because we would decide differently, but the decision to decline jurisdiction will be given closer scrutiny than normally given on an "abuse of discretion" review. We recognize that other courts have applied the "mere error" standard of review in this context, but the law of this court is to the contrary.

*Id.* (footnotes omitted). We read this passage as emphasizing the existence of an abuse-of-discretion standard of review where the district court has chosen to grant, rather than to deny, declaratory relief.

**9.** We realize that other circuits appear to have adopted slightly different standards of review. *See, e.g., National Health Federation v. Weinberger,* 518 F.2d 711, 712 (7th Cir.1975) ("Although the remedy is discretionary with the trial court, we may exercise our own judgment in determining whether a suit for declaratory and injunctive relief should be entertained."); *Broadview Chemical Corp. v. Loctite Corp.,* 417 F.2d 998, 1000 (2d Cir.1969), *cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970) (determination of trial court to grant declaratory relief " 'may ... be reversed where, though not arbitrary or capricious, it was nevertheless erroneous' ") (quoting 6A J. Moore, *Moore's Federal Practice* ¶ 57.08[2], at 57–37 (2d ed. 1982). Indeed, Professor Moore proposes the "sound position ... that the appellate court may substitute its judgment for that of the lower court." 6A J. Moore, *supra,* at 57–37.

**10.** Because we stressed in *Exxon* that "the Declaratory Judgment Act should 'have a liberal interpretation,' " 588 F.2d at 900, we determined that "the ambit of the district court's discretion is somewhat circumscribed and the range of our review is correspondingly enlarged" when the district court has *denied* declaratory relief, *id.* Thus,

**11.** *See, e.g., International Harvester Co. v. Deere & Co., supra,* 623 F.2d at 1211; *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783–84 (7th Cir.1979); *Super Products Corp. v. D P Way Corp., supra,* 546 F.2d at 753–55; *Sherwood Medical Industries, Inc. v. Deknatel, Inc.,* 512 F.2d 724, 727–28 (8th Cir.1975); *Robin Products Co. v. Tomecek,* 465 F.2d 1193, 1196 (6th Cir.1972); *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., supra,* 439 F.2d at 874; *Broadview Chemical Corp. v. Loctite Corp., supra* note 9, 417 F.2d at 1000.

Trans Tech can make out a justiciable controversy merely by showing "'any indirect or implicit or covert charge [of contempt] or threat [of suit or] . . . any conduct or course of action from which any charge or threat could be inferred.'" *Robin Products Co. v. Tomecek, supra* note 11, 465 F.2d at 1195 (quoting *Goodrich-Gulf Chemicals, Inc. v. Phillips Petroleum Co.,* 376 F.2d 1015, 1019 (6th Cir.1967)). Moreover, we must stress that, "in applying these rules to fact situations before them to determine whether or not there is an 'actual controversy' courts should make a pragmatic judgment, aware of the business realities that are involved." *Sherwood Medical Industries, Inc. v. Deknatel, Inc., supra* note 11, 512 F.2d at 728.

The long history of this litigation already has been set forth in almost tedious detail. We need only recapitulate the highlights. When Trans Tech attempted in 1978 to market the Wolf product, Interdynamics sued for patent infringement. Moreover, Interdynamics had already sued another alleged infringer and had obtained a consent decree admitting infringement and acknowledging the validity of the Barnard patent.[12] *Interdynamics, Inc. v. Budge Mfg. Co., Inc.,* No. 75–1826 (D.N.J. June 25, 1976) (order entering consent decree). When Trans Tech then produced the first Trans Tech product, Interdynamics again took legal action, this time by way of an order to show cause why Trans Tech should not be held in contempt for violating the consent decree that had been signed as part of the 1978 proceeding.

Trans Tech now seeks for the third time to manufacture and market a rear-window defroster, a product which Trans Tech feared—correctly, according to the district court—might be found to be merely colorably different from the previous two products.[13] Based on Interdynamics' prior course of conduct toward both Trans Tech and Budge Mfg. Co., we cannot say either that Trans Tech unreasonably feared Interdynamics' wrath or that the district court committed reversible error in granting what we consider to be a declaratory judgment.[14] Nor have we discovered any case denying the propriety of such relief against a backdrop of similarly ominous facts.[15]

---

**12.** In finding sufficiently "reasonable apprehension" of future legal proceedings, several cases have noted the relevance of legal action taken by the patentee against other alleged infringers. *See, e.g., Sherwood Medical Industries, Inc. v. Deknatel, Inc., supra* note 11, 512 F.2d at 728; *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., supra,* 439 F.2d at 874.

**13.** *Cf. Broadview Chemical Corp. v. Loctite Corp., supra* note 9, 417 F.2d at 1000 (reversing failure of district court to entertain declaratory action and finding "history of fierce litigation between the parties" to be evidence of justiciable controversy).

**14.** We emphasize the importance of the ongoing injunction stemming from the 1978 consent decree. This injunction allowed Interdynamics to proceed at any time against Trans Tech by way of a contempt proceeding, which is more summary and less burdensome to bring than is a full-blown infringement suit. *Cf. Interdynamics I, supra,* 653 F.2d at 97–98 (abbreviated nature of contempt proceeding is necessary to prevent patentee from having to bear expense of reestablishing scope of its patent and patent's congruence with allegedly infringing product). Thus, the standing injunction and the concomitant availability of a contempt remedy constitute a potent weapon in the hands of Interdynamics.

**15.** Interdynamics relies on the Seventh Circuit's decision in *International Harvester Co. v. Deere & Co., supra,* which found insufficient apprehension of legal action to sustain International Harvester's suit seeking a declaratory judgment that its product did not infringe a patent held by defendant Deere. Harvester sought to establish "reasonable apprehension" by emphasizing that (1) the parties already had engaged in litigation involving the same Deere patent, and Harvester had been enjoined from further infringing that patent; (2) Deere had refused to confirm that the new product detailed in a "partial drawing" submitted to it by Harvester did not infringe Deere's patent; and (3) Deere had stated that it would permit Harvester to produce its new device upon payment of money. 623 F.2d at 1211–13. The district court granted declaratory relief, and the Seventh Circuit reversed, perceiving no actual controversy.

We find *International Harvester* to be distinguishable for several reasons. First, unlike Trans Tech, Harvester was not designing its new product while subject to an ongoing injunction; the Seventh Circuit had stayed the injunction against Harvester imposed by the district court in the previous suit, 623 F.2d at 1211 n. 3, 1212. Second, we do not see in *International Harvester* a history of prior litigation between the parties as intense as that

We thus find that the "reasonable apprehension" requirement of our two-part test has been satisfied.

### 2. *Immediate Intention and Ability.*

■ Although we have found that Trans Tech reasonably feared a contempt or an infringement proceeding brought by Interdynamics, we still must determine whether Trans Tech possessed the " 'immediate intention and ability' " to produce the second Trans Tech product,[16] *Rengo Co. Ltd. v. Molins Machine Co., Inc., supra,* 657 F.2d at 539 (quoting *Wembley, Inc. v. Superba Cravats, Inc., supra,* 315 F.2d at 89). This "immediate intention and ability" must have existed at the time Trans Tech filed its motion in the district court and must have been evident from the papers submitted to that court. *International Harvester Co. v. Deere & Co., supra,* 623 F.2d at 1215.[17]

Trans Tech submitted to the district court the affidavit of its attorney, Lloyd McAulay, who stressed Trans Tech's desire to proceed immediately with its plans for the second Trans Tech product. McAulay discussed the demise of Trans Tech's previous two attempts to market a rear-window defroster and stated that, at the time of this Court's decision in *Interdynamics I, supra,* Trans Tech had accepted "substantial orders" for the first Trans Tech product. McAulay Aff. at ¶ 13. "Much of this business can be retained if Trans Tech can immediately provide an alternate product which will permit the installation of a rear window defroster as an after market item." *Id.* But, in order to accommodate these orders,

> the dispenser design has to be improved, the product has to be fabricated, orders have to be placed with a supplie[r] for the tape component of the product and shipments have to be made. Yet the heavy marketing season for Trans Tech, as a manufacturer of rear window defrosters, is August through December. Every day that passes from here on in is liekly [sic] to mean lost business.

*Id.* at ¶ 14.[18] Thus, McAulay concluded, "Trans Tech is in a position of having to fill orders for its product within the next few weeks or going out of business." [19] *Id.* at ¶ 10. We believe that this affidavit, coupled with Trans Tech's prior conduct, amply demonstrates an immediate *intention* to produce the second Trans Tech product.

Interdynamics, however, argues that Trans Tech lacked the *ability* immediately

---

which we have in the case before us. Third, the Seventh Circuit called "of some relevance" the existence of pending litigation between the parties relating to the first infringement; indeed, the court expressly relied on the fact that "the prior suit here is still pending and the injunction which initially issued had [sic] been stayed" in order to distinguish *International Harvester* from *Broadview Chemical Corp. v. Loctite Corp., supra* note 9, in which the Second Circuit reversed a failure to grant declaratory relief in an infringement case. 623 F.2d at 1212. Trans Tech and Interdynamics are not engaged in any other litigation pending before any other court; nor were any such proceedings pending when the district court ruled on Trans Tech's motion. We therefore do not believe that *International Harvester* significantly advances Interdynamics' argument.

16. Trans Tech does not claim that it actually has begun to produce the proposed rear-window defroster. We have held, however, that "[t]he actual manufacture, use, or sale of an allegedly infringing device is not a condition precedent to a suit seeking declaratory relief against the holder of the patent." *Rengo Co.*

*Ltd v. Molins Machine Co., Inc., supra,* 657 F.2d at 539. Other courts have taken the same position. *See, e.g., International Harvester Co. v. Deere & Co., supra,* 623 F.2d at 1215; *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., supra,* 439 F.2d at 874–75; *Wembley, Inc. v. Superba Cravats, Inc., supra,* 315 F.2d at 89.

17. *International Harvester* actually requires that " 'this intention should be "evident" from the preparatory steps outlined in [the] *complaint.*' " 623 F.2d at 1215 (quoting *Wembley, Inc. v. Superba Cravats, Inc., supra,* 315 F.2d at 90) (emphasis added). Because Trans Tech expressed its intention and ability in an affidavit attached to its application for an order to show cause, we find substantial compliance with the *Wembley* and *International Harvester* requirement quoted above.

18. The affidavit is dated August 25, 1981.

19. As we noted above, Trans Tech filed a petition in bankruptcy on April 20, 1982. *See supra* note 3.

to manufacture the proposed defroster because the product was only in an experimental stage. The McAulay affidavit itself referred to "Exhibit C" (the second Trans Tech product) as an "experimental sample," McAulay Aff. at ¶ 7, and detailed various expected changes in the current version: (1) the dispenser would be modified; (2) a dual tape "will probably be used, but the design could entail a single tape or a triple tape"; (3) the tape's width would be approximately one-sixteenth of an inch and not one-quarter of an inch, as on the sample, and (4) the adhesive employed to apply the tape to the automobile window would have a red-brown color. *Id.* at ¶¶ 11A–D. However, "[a]part form [sic] the width of the tape (and the addition of the coloring mentioned above), the tape is identical to a product presently being manufactured as a sensing tape for use with recording tape on tape recorders." *Id.* at ¶ 11E. McAulay further stated that Trans Tech planned to purchase this tape from a manufacturer who made it "for other usage and thus Trans Tech is not one hundred percent familiar with the exact constituents of the tape," *id.* at ¶ 11F, but McAulay did convey Trans Tech's "understand[ing]" of the composition of that tape. *Id.* at ¶¶ 11F–G. According to Interdynamics, however, these uncertainties and modifications placed the district court in the position of "render[ing] a decision with respect to an experimental product that admittedly will not be com-

mercially produced or sold. As such the issue is non-justiciable." Brief for Appellees at 11–12.

The district court, displaying considerable knowledge and sophistication, engaged in extensive colloquy with counsel on technical matters and emphatically rejected Interdynamics' argument. Far from viewing the "experimental" sample's design as too indefinite to permit adjudication, the judge found the product's essence to be perfectly unambiguous:

> THE COURT: You're going to have a mandrel on which you're going to mount two rolls of tape at a given spacing, and the mandrel will go in some sort of holder to enable the two stripes to come out at the end and be applied in approximately parallel position at that spacing.
>
> MR. MC AULAY: That's correct.
>
> THE COURT: All right [sic].

*Interdynamics, Inc. v. Firma Wolf*, No. 78–647, Tr. of Hearing ("Hearing") 17 (D.N.J. Sept. 9, 1981), App. 365.

Throughout the hearing on the show-cause order, the court demonstrated its skepticism about the importance of the details offered by Interdynamics as evidence of the second Trans Tech product's allegedly tentative and amorphous state.[20] First, the court dismissed Interdynamics' contention that the experimental sample provided no clue as to the ultimate design of the dispenser that would house the mandrel.[21]

---

**20.** The district court did not discuss the fact that the tape used in the sample was of a color different from that intended to be used in the final product; we shall assume, however, that the court deemed that difference utterly inconsequential.

**21.** THE COURT: They want to put it [the tape] on a dispenser, which they don't have at the moment.

MR. FEY: That's right.

THE COURT: You know what those look like.

MR. FEY: I have no idea.

THE COURT: You can't say you have no idea. Don't you use so much tape in your office? Don't you have dispensers where there is a roll of tape with a cutoff with teeth on it where you can dispense tape and then cut it off?

MR. FEY: There are a variety of dispensers which I have seen—

THE COURT: Functionally they aren't very different.

Hearing at 7–8, App. 355–56. Counsel for Trans Tech later confirmed the district judge's analysis of the product.

MR. MC AULAY: [T]he container will probably be modified.

THE COURT: More like the kind of thing that I mentioned, the dispenser for skotch [sic] tape?

MR. MC AULAY: It could well be. There are problems of angle and there are problems of feed and things like that.

THE COURT: If you set it up that way there wouldn't be any such problems. It is a direct feed, right?

MR. MC AULAY: That's correct.

*Id.* at 16–17, App. 364–65.

Furthermore, the court noted, the dispenser is not an essential feature of the product as measured against either the Barnard patent or the Wolf product.[22] Nor did the court find potential changes in tape width [23] or composition [24] to be significant.

Moreover, Interdynamics itself admitted that the only two critical components of the Barnard patent were the method of maintaining "appropriate space relationships between the conductors" [25] and the use of some kind of double-layer, "sandwich" device to accomplish the packaging and application of the electrical elements.[26] Thus, of all the various changes between the experimental model and the final product, only one—the dual tape—related to an essential element of the Barnard patent, spacing.

**22.** Hearing at 21, App. 369 ("The dispenser isn't part of the [1978] injunction, is it? If it is, Minnesota Mining would be in trouble.").

**23.** MR. FEY: I say [the sample is] tentative because Mr. McAulay in his affidavit has proclaimed its tentative character....
THE COURT: They want it [the tape] to be only a 16th of an inch wide [as opposed to one-quarter inch wide in the sample]; is that it?
MR. MC AULAY: That's correct.
THE COURT: So we know what it is. Hearing at 7, App. 355.

**24.** THE COURT: [W]e are talking about something rather basic, and I don't think it much matters whether the foil is aluminum or some other conducter [sic]. There is nothing in the [Barnard] patent that says it has to be aluminum.
MR. FEY: That's correct, your Honor.
THE COURT: It is a conducter [sic], an electrical conducter [sic] of suitable resistance to generate the requisite amount of heat.
Hearing at 13–14, App. 361–62.

**25.** THE COURT: ...
Now, suppose this were only a single tape, would they [Trans Tech] be guilty of ... infringement if they sold a roll of 16th inch tape with a diagram showing the user how to install it to obtain an array like the plaintiff's?
MR. FEY: Probably not, your Honor.
THE COURT: Why?
MR. FEY: Because the maintaining of the appropriate space relationships between the conductors is an aspect of our invention which is an important aspect of it.
Hearing at 26–27, App. 374–75. *See also id.* at 31, App. 379 (Mr. Fey speaking) ("Our patent is addressed to a construction which enables the

And yet, as to this feature, there actually was little uncertainty:

THE COURT: ...
Is [the dispenser] going to dispense one or two stripes at the same time?
MR. MC AULAY: It will dispense two stripes. Those are the present plans.
THE COURT: Spaced?
MR. MC AULAY: Spaced from one another. That spacing and showing of two stripes being dispensed, is embodied in this product that was submitted.
THE COURT: The sample?
MR. MC AULAY: Yes.

Hearing at 8, App. 356.[27] Thus, the court saw no obstacle to its ruling on the order to show cause.

maintenance of these appropriately spaced relationships in the application of the conductor stripes to accomplish that end result [i.e., laying an array of wires on the window]. That's what the infringement was.").

**26.** THE COURT: ... If [Trans Tech] sold [the wires] flat, it wouldn't be an equivalent [to the Barnard patent or the Wolf product], would it?
MR. FEY: I think the answer to that is that if there were no covering material of any sort overlying those [electrical] elements—
THE COURT: Something that can be pulled off, not just any covering layer. Something that can be pulled off and discarded.
MR. FEY: If he didn't roll it but had a series of them in a row and he tool [sic] off one sheet with two stripes on it, then another with two stripes on it, then another—

. . . . .

I submit it would be an infringement as well.
THE COURT: I'm talking about separate strips, not rolled, not stacked, in a box, with no covering on it.
MR. FEY: No infringement.
THE COURT: No contempt.
MR. FEY: No contempt.
Hearing at 41–42, App. 389–90.

**27.** The court noted that the design of the dispenser would not affect the spacing of the heating elements:
THE COURT: You can do the same thing [i.e., lay out parallel strips] with just a mandrill [sic]. The mandrill [sic] is this little tube on which the two roles [sic] of material are mounted. You can space that. Even without a dispenser you can put it on the glass [i.e., the window] and have it come off

We cannot say either that the district court committed clear error in finding the second Trans Tech product to be sufficiently developed or that the court abused its discretion in adjudicating the dispute. Nor can we say, on the facts before us, that Trans Tech has failed as a matter of law to demonstrate its ability "immediately" to produce and market the proposed device. The history of this litigation reveals that Trans Tech has had considerable experience in dealing with rear-window defrosters; indeed, the facts "establish the existence of a business enterprise specifically directed to the manufacture and sale of a potentially infringing product," *Super Products Corp. v. D P Way Corp., supra*, 546 F.2d at 753.[28] We note in passing our decision in *Rengo Co. Ltd. v. Molins Machine Co., Inc., supra*, in which we held that a company that "had done no more than advertise and solicit orders for its new instant order change apparatus [but] had not yet begun the manufacture or sale of the equipment," 657 F.2d at 538, could challenge the validity of a competitor's patent. We believe that Trans

Tech's situation fits within the spirit, if not the letter, of *Rengo*.[29]

The cases cited to us by Interdynamics do not compel a different conclusion. Interdynamics has relied heavily on the recent decision in *International Harvester Co. v. Deere & Co., supra*, a suit in which International Harvester ("Harvester") sought a declaratory judgment that its "CX–41 corn head" did not infringe a patent held by Deere. 623 F.2d at 1210. The Seventh Circuit held that Harvester could not maintain the action because it had failed to show an "immediate intention and ability" to produce the CX–41. 623 F.2d at 1215–17.[30]

We believe that the key to *International Harvester* lies in the following language:

> Our concern is not that the CX–41 will never be produced, but rather that because of the relatively early stage of its development, the design which is before us now may not be the design which is ultimately produced and marketed. For a decision in a case such as this to be anything other than an advisory opinion, the plaintiff must establish that the product presented to the court is the same

spaced with no dispenser at all. It is less convenient, but that's what we are talking about.

Hearing at 21, App. 369.

**28.** *Super Products* involved a suit brought by plaintiff Super Products to invalidate defendant D P Way's patent relating to "a machine for industrial vacuum cleaning that includes a self-cleaning filtration device." 546 F.2d at 750. By the time it filed its complaint, Super Products had developed "a general design for an industrial vacuum cleaner with plans for nine models." 546 F.2d at 752. The company already was "in the process of building parts for the machine," was offering a "description" of the machine and its variants to prospective customers, and was "actively soliciting orders." *Id.* The district court invalidated D P Way's patent, and the Seventh Circuit affirmed, rejecting defendant's argument that plaintiff was "merely considering the advisability of commencing production of its industrial vacuum cleaner at the time the complaint was filed," 546 F.2d at 753. Although Super Products arguably was closer to the actual production stage than was Trans Tech, we do not read the Seventh Circuit's opinion as requiring a finding that Trans Tech was not close enough to demonstrate the requisite "immediate ability" to begin future production.

**29.** We emphasized in *Rengo* that, "[b]y advertising and soliciting orders, Molins manifested a 'definite intention' to manufacture the accused device." 657 F.2d at 539. Although Trans Tech had not yet advertised or solicited orders for its proposed new product, the affidavit of its counsel established that the company had outstanding orders for a previous product, which had been removed from the market following this Court's decision in *Interdynamics I, supra*, and that Trans Tech would make every effort to fill those orders within a few weeks by manufacturing the second Trans Tech product. *See* McAulay Aff. at ¶¶ 10, 12–15. We view the existence of these outstanding orders as significant.

**30.** The Seventh Circuit based its decision primarily on its inability to perceive any "reasonable apprehension" by Harvester of an infringement suit, *see supra* note 15, and reached the "immediate intention and ability" question only as "an alternative basis for the conclusion reached in Part I," 623 F.2d at 1215. Thus, the discussion of this latter element of the two-part test could be considered pure dictum, unnecessary to the holding. We need not pursue this approach, however, in order to distinguish *International Harvester* from the case before us.

product which will be produced if a declaration of noninfringement is obtained. 623 F.2d at 1216. Harvester's CX–41 was a big, complex machine.[31] Development involved three stages: "basic design, testing, and production, including revised tooling." 623 F.2d at 1215. As of May 25, 1979, the date on which Harvester filed its suit, the CX–41 had gone through the design stage and had entered the experimental stage. *Id.* One gear case already had been subjected to 1500 hours of laboratory testing, but Harvester had yet to perform similar tests on two to five more gear cases. *Id.* Furthermore, the complete CX–41 had not yet been field-tested in the United States. 623 F.2d at 1216. The testing stage was expected to continue into 1980, and Harvester generally required a full-season test before sending the model into the production stage. *Id.* Thus, as of May 25, 1979:

> [n]o production CX–41 had been built, although a complete experimental model had been constructed; no production parts had been made; [Harvester] had provided no description of the CX–41 to its dealers or customers nor had it begun efforts to solicit orders; no maintenance manuals, operator's manuals or advertising materials had been compiled; and tooling was in its early stages.

*Id.*

The case before us is far different from *International Harvester.* Trans Tech does not seek an adjudication with respect to a complicated piece of machinery; it has brought before the Court only some strips of an adhesive-coated conductor wound around a spindle and contained in a dispenser. As the district court opined: "This is about as primitive a type of object as I can imagine. This is not like a harvesting machine." Hearing at 19, App. 367. Because of the primitiveness of the design, the court found far less danger than there was in *International Harvester* that the final product would differ significantly from the experimental model.[32] We agree.

Second, because of the difference in complexity between the CX–41 and the second Trans Tech product, actual production of the final model was much less imminent in *International Harvester* than in the case at bar. Harvester's complaint, filed on May 25, 1979, alleged that the company " 'presently plans to begin production of the CX–41 in early 1981,' " 623 F.2d at 1215, almost two years after the commencement of the lawsuit. Trans Tech, on the other hand, expressed its intention to begin production within several weeks of filing suit if it were to receive judicial clearance of its proposed product. *See* McAulay Aff. at ¶¶ 10, 13.

Third, the Seventh Circuit noted that Harvester had not yet solicited any orders for its CX–41. 623 F.2d at 1216. As we

**31.** The patent relates to the gear drive and support for a corn-harvesting row unit. In essence, a row unit is comprised of two deck plates with a restricted passage therebetween, two gathering chains and two harvesting rolls. The gathering chains are opposed parallel to each other on either side of the restricted passage between the plates. They function to draw the stalks of corn into and along the length of that passage. The harvesting rolls are likewise opposed on either side of the passage. They function to draw the stalks downward through the passage to draw the ears of corn against the plates and thereby to snap and remove the ears from the stalk for processing by the corn combine. All of such mechanism is old in the art, as is the use of drive gears and drive trains to operate the gathering chains and the rolls. The patent was held valid by reason of the fact that the inventors had rearranged essentially old elements in a non-obvious combina-

tion which achieved a result and effect for which practitioners in the art had long striven.
*International Harvester Co. v. Deere & Co.,* 478 F.Supp. 411, 412–13 (C.D.Ill.1979), *vacated and remanded,* 623 F.2d 1207 (7th Cir.1980).

**32.** THE COURT: [*International Harvester*] doesn't bind me. I don't think it's good law. It may have been suitable in that case, depending on the complexity [of CX–41]. This [the second Trans Tech product] is quite primitively simple.

. . . .

. . . I'm saying the alternatives [in design] are very, very few and very simple. It isn't difficult to lay out the whole array of choices and rule one by one. That wouldn't be the case with a piece of harvesting machinery where the combination and permutation is maybe astronomical.
Hearing at 44–45, App. 392–93.

have discussed, however, Trans Tech already had orders on file. These orders had been submitted for the first Trans Tech product, but Trans Tech believed that it would be able to fill the orders by providing the second Trans Tech product as a suitable alternative. *See* McAulay Aff. at ¶¶ 10, 13. There is no reason to doubt Trans Tech's belief.

For all of these reasons, we deem *International Harvester* inapposite to the set of facts before us. *Wembley, Inc. v. Superba Cravats, Inc., supra,* and *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., supra,* are similarly distinguishable.[33] We thus find that the district court did not abuse its discretion in determining that there was an "actual controversy" between the parties and in entertaining Trans Tech's essentially declaratory action.

### III. *The Merits: Merely Colorably Different?*

The district court, as we noted above, reached the merits of Trans Tech's motion and ruled on the question whether the production of the second Trans Tech product would violate the 1978 consent decree. Adhering to the rules expounded by this Court in *Interdynamics I, supra,* 653 F.2d at 98–99, the court compared the proposed device with the original Wolf product (the subject of the consent decree) and applied the doctrine of equivalents: " '[I]f two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though different in name, form or shape,' " *Interdynamics II, supra* note 1, slip op. at 4 (quoting *Interdynamics I, supra,* 653 F.2d at 99). The court proceeded to determine that the second Trans Tech product "will do the same work in substantially the same way to accomplish the identical same result" as the Wolf product; therefore, the former was "no more than colorably different" from the latter. *Interdynamics II, supra,* note 1, slip op. at 5. Based on this finding, the district judge ruled that the "making, using, or selling" of the second Trans Tech product would be a civil contempt of the 1978 injunction. *Interdynamics, Inc. v. Firma Wolf,* No. 78–647 (D.N.J. Oct. 2, 1981) (order and judgment holding Trans Tech in contempt).

■■ Trans Tech strongly criticizes the approach adopted by the district court, claiming that (1) the second Trans Tech product can neither be in contempt of the consent decree nor infringe the Barnard patent because the Barnard patent does not claim a defroster kit employing a dispenser to feed out the heating element; (2) the

---

**33.** Plaintiff in *Wembley* sought a judgment either invalidating defendant's patent on a particular necktie or declaring that plaintiff's " 'proposed' " necktie did not infringe defendant's patent. 315 F.2d at 88. By the time it filed suit, plaintiff had produced a single sample of its tie, which it had submitted to defendant for an acknowledgment of non-infringement. 315 F.2d at 89. The Second Circuit held that "[t]his single act ... is quite insubstantial in comparison with the steps actually taken in certain of the cases supporting jurisdiction ...." 315 F.2d at 90. Trans Tech already has exerted far greater effort than did Wembley; it is now trying for the *third time* to produce and market a simple product, which it will be able to manufacture relatively quickly.

This pattern of several repeated attempts to design a new, non-infringing product is also absent from *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., supra,* in which plaintiff merely resurrected several expired patents and made a "token sale" of 100 plastic cups based on one of three designs. 439 F.2d at 872.

Sweetheart did not retool its machinery or include the new containers in its regular product line, *id.;* moreover, it expressly viewed the cups as a fall-back product, which it intended to produce only if it lost a pending case relating to other designs, 439 F.2d at 875. The First Circuit therefore held Sweetheart's plans to be too contingent for adjudication. *Id.* The court also based its decision on the fact that related litigation had taken place in the Seventh Circuit and that "it would be more expedient to tap the acquired expertise of these two courts [i.e., the Seventh Circuit and the district court in Chicago] a second time rather than compelling another court to interpret the same patents with respect to similar containers." *Id.* Indeed, the district court in Chicago had expressed its willingness to adjudicate the matter. *Id.* Unlike Sweetheart, Trans Tech has no other forum to which it can repair. Moreover, Trans Tech has devoted more time and energy to preparing a new device for production than had Sweetheart.

trial court erred in applying the doctrine of equivalents without referring to the claims enumerated in the Barnard patent; (3) the doctrine of file-wrapper estoppel [34] precludes application of the doctrine of equivalents; and (4) the court erred in ruling on the contempt question without comparing the second Trans Tech product to the Barnard patent because the consent judgment enjoined Trans Tech only "from infringing any claim of Barnard United States patent 3,757,087." In addition, Trans Tech insists that its new rear-window defroster is more than colorably different from the Wolf product.

█ Trans Tech, however, has totally ignored the impact of our decision in *Interdynamics I, supra.* This panel is not at liberty to overrule the decision of the prior panel; rather, *Interdynamics I* is binding upon us both as a matter of precedent and as the law of the case.[35] *Interdynamics I* required the district court, in a contempt proceeding, to compare the product at issue with the Wolf product, not with the patented device, and to evaluate any differences between the two inventions by applying the doctrine of equivalents. The district court here did

precisely as we instructed, and we will not now allow relitigation of the questions of law decided in *Interdynamics I.* Thus, Trans Tech can prevail in this action only by showing that the district court committed reversible error in finding the second Trans Tech product "merely colorably different" from the Wolf product.

At the hearing before the district judge, counsel for Trans Tech elaborated various differences between the second Trans Tech product and the Wolf product: (1) the Wolf product had a cover sheet, whereas the new Trans Tech invention did not; (2) the Wolf product utilized a backer or transfer sheet absent from the second Trans Tech product; and (3) the Wolf product bore two layers of adhesive, one layer on either surface of the heating element, but the second Trans Tech product had adhesive on only one surface of the heating strip. Hearing at 61, App. 409. Moreover, Trans Tech argued, the new defroster was easier to install, *id.* at 61–63, App. 409–11, and less expensive to manufacture, *id.* at 65, App. 413, than was the Wolf product. The district court, however, found these asserted differences merely col-

---

**34.** The doctrine of file-wrapper estoppel provides that where a patentee abandons or redrafts a claim more narrowly to avoid rejection on the basis of prior art, then the substance of the claim as originally drafted that was thereby excluded cannot be recaptured by resort to the doctrine of equivalents. [Citations omitted.]

The doctrine is based on the theory that the prior art is either in the public domain or already patented, so that the patentee may not claim it as part of his invention. By redrafting or abandoning a claim in the face of a prior art rejection, the patentee is conceding that he has not invented what he thereby disclaims, and therefore will not be heard to assert, at a later date, what he disclaimed as his invention.

*Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 75 (3d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). It appears that the inventor of the device described in the Barnard patent originally had applied for a patent on a defroster kit with heating elements, adhesives, and a mounting sheet, but without any kind of protective cover or sheet that would make a "sandwich." The Patent Office rejected this claim, *see Interdynamics, Inc. v. Firma Wolf,* 493 F.Supp. at 25 n. 2 (D.N.J.1980), whereupon the claims for a single

detachable sheet were eliminated from the application. Trans Tech claims that this file-wrapper history preempts the doctrine of equivalents enunciated in *Interdynamics I, supra,* 653 F.2d at 98–99, and limits the scope of the Barnard patent to products consisting of heating elements sandwiched between two sheets.

**35.** "[A] former decision of this court [becomes] the law of the case and, once the law of a case is settled by an appellate court, it is settled for that tribunal as well as for the trial court, save for new or different facts. * * * A second appeal may not be used to raise questions in the same case already put at rest by the same court upon a prior appeal." *Antonioli v. Lehigh Coal & Navigation Co.,* 451 F.2d 1171, 1178 (3d Cir.1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972) (quoting *A.S. Kreider Co. v. United States,* 117 F.2d 133, 135 (3d Cir.1940), *rev'd on other grounds,* 313 U.S. 443, 61 S.Ct. 1007, 85 L.Ed. 1447 (1941)) (footnote omitted); *see also United States v. American Bag & Paper Corp.,* 609 F.2d 1066, 1067 n. 3 (3d Cir.1979) ("inasmuch as the determination by the prior panel stands as the law of this case, ... the present panel is bound by it").

orable under the doctrine of equivalents prescribed by this Court in *Interdynamics I, supra,* 653 F.2d at 98–99.

■ In reviewing a finding of equivalence or infringement, this Court must accept the district court's determination unless it is clearly erroneous. *Minnesota Mining and Manufacturing Co. v. Berwick Industries, Inc.,* 532 F.2d 330, 332–33 (3d Cir. 1976). *See Devex Corp. v. General Motors Corp.,* 667 F.2d 347, 359 (3d Cir.1981) (two cases), *cert. granted,* 456 U.S. 988, 102 S.Ct. 2267, 73 L.Ed.2d 1283 (1982), *cert. denied,* 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982); *Hadco Products, Inc. v. Frank Dini Co.,* 401 F.2d 462, 464 (3d Cir.1968). The Supreme Court has proclaimed that

> [a] finding of equivalence is a determination of fact . . . . Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous.

*Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 609–10, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950).[36]

■ This Court has held that "[i]t is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supporting evidentiary data." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972). One of these two conditions

must exist before we will reverse a finding of fact as clearly erroneous. *Id.*

■ Applying this scope of review, we cannot conclude that the district court committed reversible error in finding the second Trans Tech product to be "merely colorably different" from, or essentially equivalent to, the Wolf product. Both products utilize twin strips of conducting tape; both devices enable the user to lay out a parallel array of heating elements, at a fixed spatial interval; both sets of heating elements adhere to the rear windows of automobiles by means of a pressure-sensitive adhesive coating. The Wolf product protects the adhesive-coated heating elements with separate top and bottom sheets; the protective function served by those layers is approximated in the second Trans Tech product by the low-adhesive backing of the conductor mounted on the mandrel. In short, then, we cannot say that the district court's finding of equivalence either lacks any hue of credibility or bears "no rational relationship to the supporting evidentiary data," *Krasnov v. Dinan, supra,* 465 F.2d at 1302.

We will affirm the judgment of the district court.

FULLAM, District Judge, Sitting by Designation, dissenting:

I respectfully dissent.

For convenience, the various devices involved in this litigation may be referred to as "plaintiff's" (the device protected by the patent); "D1" (the original, Wolf, device, conceded to infringe the patent); "D2" (the first alternate version of defendant's prod-

---

**36.** We recognize that a finding of equivalence probably falls within that ever-troublesome category known as "questions of ultimate fact" and thus constitutes "a mixture of fact and legal precept," *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981). The Supreme Court recently has held, however, that the standard of review for questions of fact applies as well to questions of ultimate fact:

> [Fed.R.Civ.P.] 52 broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or

purport to exclude certain categories of factual findings from the obligation of a Court of Appeals to accept a district court's findings unless clearly erroneous. It does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with "ultimate" and those that deal with "subsidiary" facts.

*Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Thus, recategorization of the finding of equivalence as a finding of "ultimate fact" will not alter our scope of review.

uct, the subject of the earlier appeal to this Court); and "D3" (the second alternate version put forward by the defendant, the subject of the present proceeding).

The 1978 consent decree conclusively established, as between these parties, (1) that plaintiff's patent is valid and enforceable; and (2) that D1 infringed the patent. The defendant was permanently enjoined from marketing D1, or any other device which would infringe any of the claims of the patent.

When the defendant attempted to market D2, plaintiff sought an adjudication that defendant was violating the injunction, hence in contempt. The district court was confronted with two closely related issues, one procedural and one substantive: whether, as a matter of procedure, the issues presented could properly be resolved in a contempt proceeding, rather than in a plenary infringement action; and, whether defendant's marketing of D2 did violate the injunctive decree. In reversing the district court's determination that the defendant was not in contempt, this court ruled (as a matter of first impression in this circuit, but on the basis of firmly established precedent) that both the procedural and substantive issues merged into a single, decisive, question: Was D2 merely colorably different from D1? And, as the court further noted, the doctrine of equivalents is properly invoked, in answering that question ("Interdynamics I").

Thus, this court held that the district court had erred when it undertook a painstaking comparison between D2 and the claims of the plaintiff's patent. Rather, the district court should merely have compared D2 with D1. Such comparison, applying the Supreme Court's formulation of the Doctrine of Equivalents ("If two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape"), *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) led inexorably to the conclusion that D2 was merely a colorable differentia-

tion from D1, and that its marketing by the defendant was contumacious.

My review of the record of proceedings in the district court after the remand convinces me that the district court misconstrued certain portions of the panel opinion, particularly footnote No. 5, and believed that virtually any rear-window defroster kit marketed by the defendant would violate the injunction. As noted by the earlier panel, a new product may prove, after full-scale review, to infringe the patent, but if it is more than colorably different from the originally infringing device, contempt proceedings are not a permissible procedural vehicle for making the infringement determination. Conversely, if the two devices are merely colorably different, it is unnecessary to parse the claims of the patent before rendering a contempt adjudication. But this does not mean that equivalence is to be determined without reference to the patent, or that a defendant may be held in contempt for marketing a product which plainly does not infringe the patent.

It should be noted that the Interdynamics I opinion invokes the controlling precedent of *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra,* in which the Supreme Court stated:

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum . . . ." (339 U.S. at p. 609, 70 S.Ct. at pp. 856–57).

Moreover, the panel opinion cites with approval *Siebring v. Hansen,* 346 F.2d 474 (8th Cir.1965) in which the court stated:

"Having determined that the trial court properly ruled that the offending Siebring feeders were only colorably different from the enjoined feeders and the Hansen patent, it follows that the three offending feeders hereinabove referred to infringed the Hansen patent. The court was not, on this record, required to adjudicate the infringement issue in this contempt proceeding . . . ." (346 F.2d at p. 480).

In the present case, the trial court's "finding" that D3 is only colorably different from D1 appears in the record as follows:

"The Wolf product [D1] did not do what the Interdynamics patent [plaintiff's device] does. It lays down only two parallel, spaced strips at a time, and not the complete array. The parties agreed that this was an infringement, and the consent judgment so provides.

"Trans Tech's next product [D2], which eliminated the cover sheet, also laid down only two parallel, spaced strips at a time, as did the Wolf product, and the court of appeals ruled that by applying the doctrine of equivalents, it was not more than colorably different than the Wolf product, and so its sale and use was a contempt of the permanent injunction, without regard to whether it infringed any claim of the 087 patent.

"Applying that test, which is binding here, the proposed new product is no more than colorably different in comparison with the Wolf product. The use of two rolls of adhesive-coated conductor, placed on a mandrel for mounting in a dispenser, will do the same work in substantially the same way to accomplish the identical same results, *i.e.*, to lay down a parallel pair of conductors, at a predetermined spacing, on the rear window, to build a rectangular array to serve as a heating element." (App. 327–328).

In my view, this court's opinion in *Interdynamics I* does not mean that the defendant is precluded from marketing any device which lays down parallel heating strips at a predetermined spacing. Plaintiff's device, and D1 and D2, are all similar in that the spacing is accomplished by affixing the conductor strips to a sheet. Plaintiff's device and D1 both used a "sandwich," the upper layer of which is removed upon installation.

D2 did not employ the upper, protective, layer, but accomplished the same result by merely rolling up the sheet. The device now under consideration, D3, does not use any sheets at all. The spacing of the heating elements is achieved by means of a mandrel-type dispenser. While it accomplishes a substantially similar result, namely, laying down parallel strips of heating element at a predetermined spacing, it plainly achieves that result by a totally different method. Moreover, it is arguable that D3 may represent a decided improvement, both in ease of application, and in increased flexibility.

Because the district court's "finding" is squarely based upon an over-expansive reading of this court's earlier opinion, it constitutes an error of law, subject to plenary review in this court. And, if it be deemed a finding of fact, in my view it is clearly erroneous. Indeed, in the district court, the plaintiff did not attempt to argue that D3 was substantially identical to D1, contending only that D3 was not sufficiently concrete to permit exploration of the equivalency issue.

Thus, I would remand for the entry of an order determining that defendant's new product does not fall within the injunctive provisions of the consent decree.[1]

---

1. The majority has concluded that we have jurisdiction over this appeal because the district court's order amounted to the entry of a final declaratory judgment, appealable under 28 U.S.C. §§ 2201 and 1291. I have some difficulty with the procedural implications of that holding, but I believe we plainly have jurisdiction under 28 U.S.C. § 1292(a)(1). The district court was asked to decide whether marketing D3 would violate its injunctive decree. When the court decided in favor of the plaintiff, it was either modifying the injunction to cover the new device, or refusing to modify it so as to exclude the new device. The net effect of a declaratory judgment that a proposed course of conduct would violate an injunction is, in my view, indistinguishable from a judgment enjoining that conduct.